2006 OK 90

**Detra L. BRUNER, as next of kin of Leola Bruner (Depp), deceased, Appellee,**

v.

**TIMBERLANE MANOR LIMITED PARTNERSHIP, and its successor in interest, Timberlane Manor Limited Liability Company, d/b/a Grace Living Center, Appellants.**

No. 103,028.

Supreme Court of Oklahoma.

Dec. 12, 2006.

Rehearing Denied Jan. 29, 2007.

David K. McPhail, Steven J. Johnson, Foliart, Huff, Ottaway & Bottom, Oklahoma City, OK, for appellants.

Don S. Strong, G. Stephen Martin, Strong, Martin & Associates, and John E. Barbush, Oklahoma City, OK, for appellee.

Kenneth G. Cole, Mansell Engle & Cole, Oklahoma City, OK, for amicus curiae, Oklahoma Trial Lawyers Association.

TAYLOR, J.

¶1 On July 5, 2005, Detra L. Bruner, as next of kin of Leola Bruner, deceased, filed suit against Timberlane Manor Limited Partnership, and its successor in interest, Timberlane Manor Limited Liability Company d/b/a Grace Living Center (nursing home). The petition alleged that the nursing home's negligent care and breach of duties caused Leola Bruner's death. The nursing home moved to dismiss the suit or in the alternative to compel arbitration and stay the proceedings as required by the federal arbitration law. The district court denied the motion. The dispositive question on appeal is whether the Federal Arbitration Act applies to the nursing home's admission contract. To answer this question we must consider the body of federal and state law enforcing arbitration provisions and the body of federal and state law regulating nursing homes. We conclude that the Federal Arbitration Act does not apply to the nursing home admission contract at issue. We affirm the district court's order refusing to compel arbitration. We remand this case to the district court for further proceedings.

### I. Proceedings Below

¶2 The petition initiating this tort action alleged the following facts. Detra L. Bruner, plaintiff/appellee (plaintiff), is the daughter of Leola Bruner, deceased. On June 22, 2004, plaintiff, as her mother's attorney in fact, signed the contract for her mother to be admitted as a resident patient at Grace Living Center, defendant/appellant, a state licensed nursing care facility in Edmond, Oklahoma. When she was admitted to the nursing home, Leola Bruner was sixty-six years old and physically frail, and her deci-

sion-making abilities and mental facilities were impaired. Leola Bruner resided at the nursing home from June 22, 2004 until July 17, 2004, when she was hospitalized. Leola Bruner died on August 31, 2004.

¶3 The petition further alleged that during her residency at the nursing home, Leola Bruner was dependent upon the nursing home and its agents and employees for proper hydration and nutrition, personal care and attention, and prevention and treatment of any illness and injuries; but the nursing home failed to provide Leola Bruner with adequate and proper daily care and supervision, adequate and appropriate nourishment, and necessary and reasonable medical treatment and services. It also alleged that Leola Bruner suffered injuries and illnesses, including a fractured hip and malnutrition, caused by the nursing home's negligence and breach of duties. The petition asked for actual and punitive damages for the wrongful death of Leola Bruner, allegedly caused by the nursing home's negligence and its violation of the Patients' Bill of Rights in the Oklahoma Nursing Home Act.

¶4 In response to the petition, the nursing home appeared specially and asked the district court to dismiss the petition and enforce the binding arbitration agreement in the admission contract. The nursing home relied on the dispute resolution provisions in its admission contract which provided that all disputes "arising out of or in connection with the care rendered to the Resident by GLC [Grace Living Center] and/or arising out of or in connection with the Admission Agreement pursuant to which said care is rendered" are to be resolved by binding arbitration.[1]

¶5 The nursing home took the position that its admission contract involved or affected interstate commerce because in its operation, the nursing home 1) receives Medicare payments that originate outside the state of

---

1. The dispute resolution provisions were set forth at pages 16 and 17 of the nursing home admission contract which plaintiff signed at page 18 just below a notice in enlarged print that read: NOTICE: BY SIGNING THIS AGREEMENT THE RESIDENT AGREES TO HAVE ANY RESIDENT/GLC [Grace Living Center] DISPUTE DECIDED BY NEUTRAL BINDING AR-

BITRATION AND WAIVES ANY RIGHT TO TRIAL IN A COURT OF LAW OR EQUITY; PROVIDED; HOWEVER, THAT THE PARTIES MAY RESOLVE ANY RESIDENT/GLC DISPUTE BY NEGOTIATION BY AND BETWEEN THEMSELVES OR BY USE OF AN AGREED UPON THIRD PARTY MEDIATOR.

Oklahoma, 2) complies with federal Medicare and Medicaid licensing rules and regulations, including routine inspections/surveys by out-of-state federal investigators/surveyors, 3) purchases medical and non-medical supplies from out-of-state vendors, and 4) uses instruments of interstate commerce such as telephone lines, internet, airlines and the federal postal service. The nursing home argued that the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1, *et seq.*, and the Oklahoma Uniform Arbitration Act (OUAA), 15 O.S.2001, §§ 801, *et seq.*, govern the nursing home admission application and that the FAA preempts and displaces the state's anti-arbitration statute in the Oklahoma Nursing Home Care Act at 63 O.S.2001, § 1–1939(D) and (E).

¶ 6 The district court found that "the nursing home care at issue does not involve interstate commerce, the Federal Arbitration Act does not apply, and Sections 1–1939(D) and (E) of the Oklahoma Nursing Home Care Act, 63 O.S. §§ 1–1901 et seq., are not preempted." Thereupon, the district court found "the arbitration agreement between the parties unenforceable, and Sections 1–1939(D) and (E) of the Oklahoma Nursing Home Care Act remain applicable." The district court denied the nursing home's motion to dismiss or in the alternative to compel arbitration and stay proceedings. The nursing home appealed the interlocutory order which is appealable by right under the OUAA. 12 O.S.Supp.2005, § 1879 [2] and Okla. Sup.Ct.R. 1.60(i), 12 O.S.2001, ch.15, app. Upon plaintiff/appellee's motion, we retained the appeal.

## II. Standard of Review

¶ 7 The issues raised on appeal by the nursing home are: 1) whether the district court erred in finding that the nursing home care of Leola Bruner did not involve interstate commerce and that the FAA does not govern the nursing home's admission application; 2) whether a strong federal interest should be presumed in matters in which federal funds, such as Medicare funds, are utilized; 3) whether Oklahoma law recognizes a

strong public policy favoring arbitration agreements; and 4) whether the district court erred in finding the arbitration provisions in the nursing home's admission application unenforceable under the Oklahoma Nursing Home Care Act. As to the interstate commerce issue, plaintiff urges that it is a question of fact to be reviewed for abuse of discretion, while the nursing home urges that it requires interpretation of the FAA to be reviewed by a *de novo* standard. Both parties urge that all other issues should be reviewed by a *de novo* standard.

¶ 8 Generally, the existence of an agreement to arbitrate is a question of law to be reviewed by a *de novo* standard. *Rogers v. Dell Computer Corp.*, 2005 OK 51, ¶ 11, 138 P.3d 826, 831. However, an application to compel arbitration may present questions of fact and law as to the existence or the enforceability of an arbitration agreement. *See, id.* at ¶¶ 15–17, 830–831 (delineating procedures on applications to compel arbitration that present questions of fact or law relating to the existence or enforcement of an arbitration agreement). Where the facts are controverted, mixed questions of fact and law may require deferential review standards. *Feightner v. Bank of Okla.*, 2003 OK 20, ¶ 3, 65 P.3d 624, 627.

¶ 9 Whether a transaction involves interstate commerce under the FAA is often a mixed question of fact and law. *See Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003). Here, plaintiff did not controvert the evidence the nursing home submitted in support of its contention that nursing home care is a transaction involving commerce under the FAA. Where the facts are undisputed, the controversy presents questions of law. *Feightner*, 2003 OK 20, at ¶ 3, 65 P.3d at 627. We review questions of law by a *de novo* standard and without deference to the lower court. *Gladstone v. Bartlesville Indep. Sch. Dist. No. 30*, 2003 OK 30, ¶ 5, 66 P.3d 442, 445.

¶ 10 We begin with an overview of the United States Supreme Court decisions construing the FAA, the state arbitration law,

---

**2.** The OUAA, codified at 15 O.S.2001, §§ 801, *et seq.*, was recodified at 12 O.S.Supp.2005,

§§ 1851, *et seq.*, effective January 1, 2006. 2005 Okla.Sess.Laws, ch.364.

and the pertinent federal and state nursing home regulations. Against this backdrop, we consider *de novo* whether the FAA applies to the nursing home's admission contract.

## III. The Federal Arbitration Act

¶ 11 Pursuant to its power over admiralty and interstate commerce, Congress, in 1925, enacted the FAA to make arbitration agreements as enforceable as other contracts but not more so. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404–405, n. 12–13, 87 S.Ct. 1801, 1806–1807, 18 L.Ed.2d 1270 (1967).[3] The FAA's principal objective was to enforce arbitration agreements made by the parties to interstate commerce and maritime transactions, *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–220, 105 S.Ct. 1238, 1241–1242, 84 L.Ed.2d 158 (1985),[4] and place arbitration agreements in commercial contracts upon the same footing as other contracts. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225–226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987).[5]

¶ 12 Section 2 of the FAA is the substantive section. It is a declaration of a "liberal federal policy favoring arbitration agreements," which effectively creates "a body of federal substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).[6] Section 2 imposes upon the

**3.** *Prima Paint Corp.* involved a claim of fraud in the inducement of a consulting agreement between two corporations. The consulting agreement included an arbitration provision. The issue was who should decide the fraud-in-the-inducement claim—the court or the arbitrator. In resolving the issue, the High Court found the agreement was inextricably tied to interstate commerce, inasmuch as "Prima Paint acquired a New Jersey paint business serving at least 175 wholesale clients in a number of States, and secured F & C's assistance in arranging the transfer of manufacturing and selling operations from New Jersey to Maryland." [footnote omitted] 388 U.S. at 401, 87 S.Ct. at 1804–1805. *Prima Paint Corp.* held that a federal court may decide issues relating to the making and performance of the arbitration agreement, but issues relating to the making of the contract containing the arbitration agreement must be sent to the arbitrator. 388 U.S. at 404, 87 S.Ct. at 1806. *Prima Paint Corp.* was recently reaffirmed in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006).

**4.** *Byrd* was a suit against a brokerage firm alleging claims under federal and state securities law. The brokerage firm moved to compel arbitration of the state claims but not the federal claims. In ordering the state claims to arbitration, *Byrd* recognized the FAA was motivated by congressional desire to enforce agreements into which the parties had entered and this underlying motive must not be overlooked when construing the statute. 470 U.S. at 220, 105 S.Ct. at 1242. *Byrd* noted the FAA "creates no new legislation, grants no new rights, except a remedy to enforce an agreement in commercial contracts and in admiralty contracts." 470 U.S. 220, n. 7, 105 S.Ct. at 1242, n. 7 (citing 65 Cong.Rec.1931 (1924)).

**5.** *McMahon* involved a securities brokerage firm's customer agreement providing for arbitration of any controversy relating to the customer accounts with the brokerage firm. The customer filed tort and RICO claims based on allegations that the licensed broker had engaged in fraudulent and excessive trading and had made misrepresentations and false statements. The United States Supreme Court ruled that the parties' arbitration agreement must be rigorously enforced.

**6.** *Moses H. Cone Mem'l Hosp.* noted that the FAA "is something of an anomaly in the field of federal jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal jurisdiction ... [so that] enforcement of the Act is left in large part to the state courts...." 460 U.S. at 26, n. 32, 103 S.Ct. at 942. *Moses H. Cone Mem'l Hosp.* also noted that state courts had almost unanimously recognized that the stay provision in the FAA applied to suits in state court as well as federal court. 460 U.S. at 26, n. 34, 103 S.Ct. at 942.

*Moses H. Cone Mem'l Hosp.* involved a construction contract between a North Carolina hospital and an Alabama construction company. The contract, drafted by hospital representatives, provided for disputes to be submitted first to the architect and then to binding arbitration in accordance with Construction Industry Arbitration Rules of the American Arbitration Association. The parties submitted a dispute over delay and impact costs to the architect, but then the hospital filed a declaratory judgment action in state court and the construction company filed an action in federal court. In its federal suit, the construction company moved to send the controversy to arbitration. The hospital urged that arbitration would cause piecemeal resolution of the controversy in that it had an arbitration agreement with the construction company but not with the architect. The federal district court

courts the substantive duty to honor arbitration agreements and order the parties to arbitrate when they have agreed to do so. *Id.* at 25, n. 32, 103 S.Ct. at 942. Section 2 of the FAA, 9 U.S.C. § 2, reads:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

¶ 13 The United States Supreme Court interpreted § 2 of the FAA as withdrawing from the states the power to require a judicial forum for the resolution of disputes which the contracting parties agreed to resolve by arbitration. *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984).[7] In a later decision, the Court explained that state law, legislative or judicial, may apply to the arbitration provisions in a contract involving interstate commerce "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with the text of 9 U.S.C. § 2." *Perry v. Thomas*, 482 U.S. 483, 492, n. 9, 107 S.Ct. 2520, 2527, 96 L.Ed.2d 426 (1987).[8]

¶ 14 The United States Supreme Court construed § 2 of the FAA as applying to every arbitration agreement into which private parties had entered within the full reach of the Commerce Clause.[9] *Id.* at 491, 107 S.Ct. at 2526. The reach of the Commerce Clause and the FAA was most recently addressed in 2003 in *Citizens Bank v. Alafabco, Inc.*, 539 U.S. at 56–57, 123 S.Ct. at 2040. Under *Citizens Bank*, Congress' Commerce Clause power and the FAA extend to an individual case without showing any specific effect upon interstate commerce if in the aggregate the economic activity involved in that case represents a general practice subject to federal control and the general practice substantially affects interstate commerce. Two earlier arbitration decisions instrumental in the development of the *Citizens Bank* rule are *Bernhardt v. Polygraphic Co. of America, Inc.*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), and *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

¶ 15 *Bernhardt* involved an employment contract entered into in New York to be performed in Vermont. *Bernhardt* determined the employment contract did not involve interstate commerce because there was "no showing that petitioner while performing his duties under the employment contract

stayed the action pending resolution of the action in state court. The Court of Appeals reversed, determined that the FAA applied to the construction contract and directed the parties to arbitration. The Supreme Court affirmed the Court of Appeals even though the hospital would have to defend in arbitration and proceed with its claim against the architect in state court.

7. *Southland Corp.* involved 7–Eleven's standard franchise agreement with a license to use registered trademarks, a lease for the convenience store, inventory financing, and advertising and marketing assistance. Several franchisees sued alleging breach of contract, fraud, and misrepresentation. 7–Eleven responded alleging a failure to arbitrate. The franchisees relied on a California statute prohibiting arbitration provisions in franchise agreements. *Southland Corp.* concluded that Congress intended the FAA to apply in state courts and intended to foreclose state legislative attempts to undercut the enforceability of

arbitration agreements and ruled that the FAA preempted and displaced the state anti-arbitration statute.

8. In *Perry*, a securities brokerage firm employee sought to recover commissions allegedly earned on securities sales. His employment contract provided for arbitration. The employee relied on a California statute providing that a wage-collection suit may be maintained without regard to the existence of an arbitration agreement. As in *Southland Corp., Perry* concluded that Congress intended the FAA to foreclose state legislatures from undercutting the enforceability of arbitration agreements and ruled that the FAA preempted and displaced the state anti-arbitration statute.

9. U.S. Const., Art. I, § 8, cl. 3.

was working 'in' commerce, was producing goods for commerce, or was engaging in activity that affected commerce within the meaning of our decisions." 350 U.S. at 200–201, 76 S.Ct. at 274–275.

¶ 16 *Allied–Bruce Terminix* involved a lifetime "Termite Protection Plan" purchased by a homeowner in Birmingham, Alabama, from a local office that was a franchisee of Terminix International Company. The Alabama Supreme Court had applied a contemplation-of-the-parties test and had decided that the transaction was local and not substantially interstate and that the FAA did not govern the contract. Interpreting § 2 of the FAA, the United States Supreme Court in *Allied–Bruce Terminix* concluded that "involving commerce" has broad meaning and is the functional equivalent of "affecting commerce." 513 U.S. at 273–274, 115 S.Ct. at 839. Observing that the Commerce Clause has been expanded since the enactment of the FAA, *Allied–Bruce Terminix* also concluded that the scope of the FAA should be expanded along with the expansion of the Commerce Clause power itself. 513 U.S. at 275, 115 S.Ct. at 840. Rejecting the contemplation-of-the-parties test, *Allied–Bruce Terminix* adopted the "commerce in fact" test— that the transaction evidenced by the contract must turn out in fact to have involved interstate commerce even if the parties did not contemplate an interstate commerce connection. 513 U.S. at 281, 115 S.Ct. at 843.

¶ 17 The parties in *Allied–Bruce Terminix* did not contest that the transaction in fact involved interstate commerce. 513 U.S. at 280, 115 S.Ct. at 842–843. However, the United States Supreme Court tested the facts established in *Allied–Bruce Terminix* and found the termite treatment in fact involved interstate commerce in that both Allied–Bruce and Terminix were multistate businesses and the termite-treating and house-repairing materials used by Allied–Bruce came from outside of Alabama.

¶ 18 In adopting the "commerce in fact" test, *Allied–Bruce Terminix* was mindful of the states' interest in protecting their consumers from overreaching business practices. *Allied–Bruce Terminix* recognized that Congress, in enacting the FAA, was well aware of consumer needs for a less expensive alternative to litigation to complain about products and relied on comparisons between arbitration and litigation to the effect that arbitration would be cheaper and faster, have more flexibility in scheduling hearings, have simpler procedural and evidentiary rules, minimize hostility and be less disruptive to ongoing and future business dealings between the parties. 513 U.S. at 280, 115 S.Ct. at 842–843. The Court explained that § 2 of the FAA allows a state to enact general laws to protect its consumers from unfair pressure to agree to unwanted arbitration provisions:

> States may regulate contracts, including arbitration clauses, under general contract principles.... What states may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal "footing," directly contrary to the Act's language and Congress' intent.

513 U.S. at 281, 115 S.Ct. at 843.

¶ 19 *Citizens Bank* involved a debt-restructuring agreement executed in Alabama between an Alabama bank and an Alabama construction company for the payment of a series of commercial loans. The Alabama Supreme Court had found the nexus between the debt-restructuring agreement and interstate commerce insufficient to trigger the FAA. In *Citizens Bank*, the United States Supreme Court reaffirmed that "involving commerce" in the FAA is the functional equivalent of "affecting commerce"—words of art signaling the broadest permissible exercise of the Commerce Clause power, 539 U.S. at 56, 123 S.Ct. at 2040 and aligned the FAA interstate commerce principles with those relating to other federal legislation: [10]

---

**10.** *Citizens Bank* relied on *Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)(Sherman Act/price fixing); *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)(Extortion crime/loan sharks); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)(Agriculture Act/price controls); *Maryland v. Wirtz,*

Congress' Commerce Clause power "may be exercised in individual cases without showing any specific effect upon interstate commerce" if in the aggregate the economic activity in question would represent "a general practice ... subject to federal control." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).... Only that general practice need bear on interstate commerce in a substantial way. *Maryland v. Wirtz*, 392 U.S. 183, 195–196, n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968);....

539 U.S. at 56–57, 123 S.Ct. at 2040.

¶ 20 *Citizens Bank* decided the debt-restructuring agreement satisfied the "involving commerce" test: 1) the commercial loans were the underlying economic activity which the construction company used in its business throughout the southeastern states; 2) the restructured debt was secured by an inventory of goods assembled from out-of-state parts and raw materials; and 3) commercial lending, as a general practice, has a broad impact on the national economy which Congress may regulate pursuant to its Commerce Clause power. 539 U.S. at 57–58, 123 S.Ct. at 2040–2041. Explaining Congress' Commerce Clause power over the local concern, *Citizens Bank* said:

> 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)(National Labor Relations Act/hour and wage); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937)(National Labor Relations Act/union discrimination); and *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964)(Civil Rights Act/restaurant race discrimination).
>
> These cases shed light on the economic activity which in the aggregate represents a "general practice subject to federal control" under the Commerce Clause. For instance, *Mandeville Island Farms*, in deciding that sugar refiners may not agree among themselves to pay a uniform price for sugar beets grown in California, said Congress' power to keep the interstate market free of goods produced under conditions inimical to the general welfare may be exercised in individual cases without showing any specific effect upon interstate commerce; it is enough that the individual activity when multiplied into a general practice is subject to federal control. 334 U.S. at 236, 68 S.Ct. at 1006. *Wirtz* included hospitals and schools operated by states and their political subdivisions within the reach of the federal maxi-

No elaborate explanation is needed to make evident the broad impact of commercial lending on the national economy or Congress' power to regulate that activity pursuant to the Commerce Clause. *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 38–39, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). ("[B]anking and related financial activities are of profound local concern.... Nonetheless, it does not follow that these same activities lack important interstate attributes"); *Perez, supra*, at 154–155, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 ("Extortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce").

539 U.S. at 58, 123 S.Ct. at 2041.[11]

¶ 21 Even though the courts must enforce arbitration agreements that fall within the broad reach of § 2 of the FAA, those agreements may be overridden by their own terms. An arbitration agreement under the FAA is to be enforced according to its terms, and since parties are generally free to structure contracts as they see fit, an arbitration agreement may limit the issues that will be arbitrated and it may specify the rules under which the arbitration will be conducted. *Volt Info. Sci., Inc. v. Bd. of Trustees of the Leland Stanford Junior U.*, 489 U.S. 468, 109

> mum hours and minimum wage statutes upon finding that labor conditions in schools and hospitals can affect commerce, but also noting that activity that has a relatively trivial or *de minimus* impact on commerce is not an excuse for broad interstate commerce regulation. 392 U.S. at 196, n. 27, 88 S.Ct. at 2024. *Katzenbach*, an action to enjoin the enforcement of the Civil Rights Act in an Alabama restaurant, held that Congress had ample basis upon which to find that racial discrimination at restaurants had direct and adverse effect on interstate commerce because a substantial amount of the food it served had moved in interstate commerce.

**11.** *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980), found two Florida statutes regulating the conduct of investment advisory and trust services discriminated against out-of-state bank holding companies and burdened interstate commerce. *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), upheld a federal statute criminalizing extortionate debt-collection practices.

S.Ct. 1248, 103 L.Ed.2d 488 (1989).[12] In *Volt,* the United States Supreme Court said:

> Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward. By permitting the courts to "rigorously enforce" such agreements according to their terms, see *Byrd, supra,* we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by [sic] the FAA.

489 U.S. at 479, 109 S.Ct. at 1256.

¶ 22 Further, the FAA standing alone mandates enforcement of agreements to arbitrate statutory claims, but like any statutory directive the FAA's mandate may be overridden by a contrary congressional command. *Shearson/American Express, Inc. v. McMahon,* 482 U.S. at 226–227, 107 S.Ct. at 2337. The burden is on the party opposing arbitration to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue; an intention discernible from the statute's text or legislative history or "an inherent conflict between arbitration and the statute's underlying purposes." *Id.* .

### IV. The State Arbitration Law

¶ 23 The state counterpart to § 2 of the FAA is § 1857(A) of the OUAA. It provides that arbitration agreements shall be valid, enforceable and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract. 12 O.S.Supp.2005, § 1857(A). This section is a clear expression of Oklahoma's policy favoring arbitration agreements. *See, Voss v. City of Oklahoma City,* 1980 OK 148, 618 P.2d 925; *Rollings v.*

*Thermodyne Indust., Inc.,* 1996 OK 6, 910 P.2d 1030.

¶ 24 On the other hand, § 1–1939 of the Nursing Home Care Act conflicts with the command of § 1857 of the OUAA. It provides that any waiver of the right to commence an action against the nursing home owner or licensee for any intentional or negligent act or omission shall be null and void and without legal effect. 63 O.S.2001, § 1–1939. It is a clear rejection of arbitration agreements between nursing homes and their residents.

¶ 25 Although the United States Supreme Court has decided that the FAA preempts and displaces a state anti-arbitration statute, we have not decided that the OUAA controls over anti-arbitration statutes such as § 1–1939 in the Nursing Home Care Act. Rather, a well established principle in this jurisdiction is that where two statutes address the same subject, one specific and one general, the specific statute will govern over the general. *Trimble v. City of Moore,* 1991 OK 97, 818 P.2d 889; *Hall v. Globe Life and Accident Ins. Co. of Oklahoma,* 1999 OK 89, 998 P.2d 603. Under this principle, the specific statute in the Nursing Home Care Act addressing the right to commence an action and to have a jury trial must govern over the more general statute favoring arbitration.

### V. The Nursing Home Regulations

¶ 26 Nursing homes are regulated by a maze of state and federal regulations for the health, safety and welfare of the residents. Historically, regulation of health and safety matters are matters of local concern. *Hillsborough County, Florida v. Automated Medical Lab., Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985). However, Congress has imposed conditions on the receipt of federal funds for medical care of the aged, disabled and needy [13] and thereby reg-

---

12. *Volt* involved a construction contract for an electrical conduit system on the Stanford University campus. The contract had an arbitration clause and a choice-of-law clause providing that the law of the location of the project shall govern the contract. When a dispute arose over compensation for extra work, Stanford filed suit alleging fraud and breach of contract and also claiming indemnity from two other companies involved in the project with which there was no arbitration agreement. The issue was whether the FAA preempted a California statute that would have allowed a stay of arbitration under the circumstances. The Court answered in the negative based on the parties' choice of California law.

13. Medicare is a federal program designed to provide health insurance for aged and disabled

ulates the health, safety and welfare of nursing home residents through its spending power.[14] To receive the federal funds, the state regulations must conform to the federal regulations. *Wilder v. Virginia Hosp. Assoc.*, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990), explained:

> Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals. [42 U.S.C.] § 1396. Although participation in the program is voluntary, the participating States must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services (Secretary). To qualify for federal assistance, a State must submit to the Secretary and have approved a "plan for medical assistance," § 1396a(a), that contains a comprehensive statement describing the nature and scope of the State's Medicaid program. 42 CFR § 430.10 (1989).

¶ 27 The federal regulations for long-term care facilities apply to nursing homes. 42 C.F.R. § 483.5 (defining "facility"). The regulations concern both the operation of the facility and the care for and rights of the residents.[15] The most pertinent regulations require the facility to be licensed under applicable State and local law, *id.* § 483.75(a); to provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility, *id.* § 483.75(b); and to provide each resident with a written statement of legal rights, including the right to file a complaint with the State survey and certification agency concerning resident abuse and neglect and the right to have the names and addresses of all pertinent state client advocacy groups such as the State survey and certification agency, the State licensure office, the State ombudsman program, the protection and advocacy network, and the medicaid fraud unit. *Id.* § 483.10. Consistent with the federal statute permitting the states to devise a fair mechanism for hearing appeals on transfers and discharges of residents from nursing facilities, 42 U.S.C. § 1396r(c)(2) and (f)(3), the appeal procedure regulations provide that a resident has a right to agency hearings and judicial review as allowed by law. 42 C.F.R. § 431.245.[16]

---

persons, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, administered by the Health Care Financing Administration of the United States Department of Health and Human Services. Medicaid is a federal program designed to assist participating states to provide medical care to needy persons. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* All fifty states participate in Medicaid. *Brogdon v. National Healthcare Corp.*, 103 F.Supp.2d 1322, 1327 (N.D.Ga.2000).

**14.** U.S. Const., art. I, § 8, cl.1. *See, Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Suter v. Artist*, 503 U.S. 347, 356, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992).

**15.** The nursing home regulations are codified at 42 C.F.R., ch. IV (10–1–05), Part 483, §§ 483.1, *et seq.* In summary, the regulations require that the facility be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practical, mental, and psycho-social well-being of each resident. *Id.* § 483.75. The facility must establish and maintain identical policies and practices regarding transfer, discharge, and the provision of services under the State plan for all individuals regardless of source of payment. *Id.*

§ 483.12(c). States or political subdivisions may apply stricter admissions standards under State or local laws than are specified in this section to prohibit discrimination against individuals entitled to Medicaid. *Id.* § 483.12(d)(4). The facility must conduct, initially and periodically, comprehensive, accurate, standardized, reproducible assessments of each resident's functional capacity and needs. *Id.* § 483.20. Each resident must receive and the facility must provide the necessary care and services to attain and maintain the highest practicable physical, mental, and psycho-social well-being in accord with the comprehensive assessment and plan of care. *Id.* § 483.25.

**16.** Hearings on resident complaints are regulated under 42 C.F.R. §§ 431.200, *et seq.* These regulations require that the State plan provide for fair hearings in accordance with the regulations, *id.* § 431.202; the evidentiary hearings must meet due process standards, *id.* § 431.205; provide a resident a hearing if the resident thinks the nursing home erroneously assessed medical needs or determined to transfer or discharge the resident, *id.* § 431.220; provide a resident an appeal to the agency, *id.* § 431.232; require record of the evidentiary hearing accessible to the public, *id.* § 431.244; and provide a resident agency hearings and judicial review as allowed by law. *Id.* § 431.245.

¶ 28 Oklahoma participates in the federal Medicaid program.[17] Oklahoma nursing homes that are reimbursed through the Medicaid program are governed not only by federal law but also by the Nursing Home Care Act (NHCA), 63 O.S.2001, §§ 1–1901, *et seq.*[18]

¶ 29 The NHCA requires the State Department of Health to establish a comprehensive system of licensure and certification to protect the health, welfare and safety of the residents and assure accountability for reimbursed care. 63 O.S.2001, § 1–1904. The NHCA enumerates the rights and responsibilities of residents, commonly referred to as the Nursing Home Patients' Bill of Rights. *The Estate of Ilar Hicks v. Urban East, Inc.*, 2004 OK 36, 92 P.3d 88; 63 O.S. 2001, § 1–1918(B).[19] A violation of the Pa-

---

With regard to these fair hearing regulations, the federal Medicare and Medicaid agencies issued a policy memorandum stating that fair hearing requirements are not affected by binding arbitration agreements:

The purpose of this memorandum is to address the Centers for Medicare & Medicaid Services' (CMS) position regarding binding arbitration between nursing homes and prospective or current residents, in response to recent marketplace practices. Specifically, this memorandum addresses the use of an agreement that requires disputes between a prospective or current resident and the nursing home be resolved through binding arbitration either as a condition of admission or a condition of remaining in the nursing home. Under these agreements, the resident gives up his or her right to sue the nursing home through the judicial process.

CMS believes that its primary focus should be on the quality of care actually received by nursing home residents that may be compromised by such agreements, for the reasons set out below. Under Medicare, whether to have a binding arbitration agreement is an issue between the resident and the nursing home. Under Medicaid, we will defer to State law as to whether or not such binding arbitration agreements are permitted subject to the concerns we have where Federal regulations may be implicated. Under both programs, however, there may be consequences for the facility where facilities attempt to enforce these agreements in a way that violates Federal requirements.

**Survey and Certification Guidance**

1. If a nursing home discharges a resident or retaliates due to an existing resident's failure to sign or comply with a binding arbitration agreement, the State and Region may initiate an enforcement action based on a violation of the rules governing resident discharge and transfer. A current resident is not obligated to sign a new admission agreement that contains binding arbitration. Federal regulations, at 42 C.F.R. § 483.12(a)(2) limit the circumstances under which a facility may discharge or transfer a resident. None of these conditions specified in the regulation permit a facility to discharge or transfer a resident based on his or her failure to comply with the terms of a binding arbitration agreement. Additionally, a facility that retaliates against a resident who fails to sign or comply with the agreement is subject to an enforcement response based on its failure to comply with the obligation to furnish an abuse free environment under 42 C.F.R. § 483.13(b) or other requirements bearing on the facility's obligation to provide quality care to all residents. The existence of a binding arbitration agreement does not in any way affect the ability of the State survey agency or CMS to assess citations for violations of certain regulatory requirements, including those for Quality of Care.

2. The Medicaid appeal procedures at 42 C.F.R. § 431.200 et seq. apply to discharges or disputes of eligibility between the resident and the State Medicaid Agency and are not affected by a binding arbitration agreement.

Memorandum from Centers for Medicare and Medicaid Services to the Survey and Certification Group Regional Office Management (G–5) State Survey Agency Directors (Jan. 9, 2003) at http://www.nsclc.org/news/o3/02/s & c1003.htm. *See,* Anne E. Krasuski, *Mandatory Arbitration Agreements Do Not Belong in Nursing Home Contracts,* 8 DePaul J. Health Care L. 263, 289 (2004).

17. The Oklahoma Medicaid program is established in the Oklahoma Medicaid Program Reform Act of 2003, 56 O.S.Supp.2003, §§ 1010.1–1010.7. It provides health care coverage to individuals who are 1) eligible under the minimum eligibility requirements established by the Oklahoma Health Care Authority in accordance with Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.,* 2) under the age of eighteen years and the family income does not exceed 185% of the federal poverty level, or 3) included in a small employer's buy-in coverage. The Oklahoma Medicaid program is a managed care system with prepaid capitated health plans and primary care physicians operated by two state agencies, the Oklahoma Health Care Authority and the Department of Human Services.

18. *See,* 63 O.S.2001, § 1–1903(E).

19. The rights of every resident enumerated in § 1918(B) include the right to receive 1) services with reasonable accommodation of individual needs and preferences, 2) courteous and respectful care and treatment and 3) adequate and appropriate medical care consistent with estab-

tients' Bill of Rights is declared to be a misdemeanor and residents are permitted to commence a private cause of action to redress violations of the Patients' Bill of Rights.[20] The NHCA requires a written contract between the resident and the facility on a general form prescribed by the Department of Health which must provide that the contract terminates if the resident leaves the facility due to physical or mental health or upon the death of the resident. 63 O.S.2001, § 1-1921. And, the NHCA imposes liability upon the nursing home owner and licensed administrator for intentional or negligent injury to a resident. It also declares a resident's waiver of the right to commence an action against the owner or administrator or to have a jury trial thereon to be null, void and without legal effect. 63 O.S.2001, § 1-1939.

## VI. The Parties' Arguments

¶ 30 The nursing home asserts that both the FAA and the OUAA must be applied because the existence of the arbitration agreement is not disputed. It argues that both the FAA and the OUAA strongly favor arbitration and that the FAA preempts any state law hostile to arbitration. The nursing home also asserts that its evidence [21] established that the nursing home care at issue involves interstate commerce as measured by the "commerce in fact" test in *Allied–Bruce Terminix.* The interstate commerce connection is the nursing home's pivotal argument.

¶ 31 Nursing home argues that the receipt of Medicare payments indicates interstate commerce, relying on *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842,

114 L.Ed.2d 366 (1991); *McElhinney v. Medical Protective Co.,* 549 F.Supp. 121 (E.D.Ky. 1982); *BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Assoc.,* 36 F.3d 664 (7th Cir.1994); and state court decisions from Alabama, Mississippi and Texas. The federal district court's ruling in *McElhinney* affords no support to the nursing home because it was reversed by an unpublished opinion of the Court of Appeals for the Sixth Circuit. 738 F.2d 439 (6th Cir.1984)(Table). For the reasons set out below, we are not persuaded by the other cases relied upon by the nursing home.

¶ 32 *Summit Health Ltd.* addressed the question as to "whether the interstate commerce requirement of antitrust jurisdiction is satisfied by allegations that petitioners conspired to exclude respondent, a duly licensed and practicing physician and surgeon, from the market for ophthalmological services in Los Angeles because he refused to follow an unnecessarily costly surgical procedure." 500 U.S. at 324, 111 S.Ct. at 1844. *Summit Health Ltd.* only mentioned Medicare payments as an allegation in the complaint along with allegations that Summit owned and operated 19 hospitals and 49 other health care facilities in six other states and Saudi Arabia. 500 U.S. at 327–328, 111 S.Ct. at 1846. The Court said that Summit was unquestionably engaged in interstate commerce, but it did not decide that Medicare payments make the interstate commerce connection.

¶ 33 *BCB Anesthesia Care, Ltd.* involved a hospital staffing dispute between nurse anesthetists and physician anesthetists. The nurses complained that the Illinois hospital restricted their practice in violation of the

---

lished and recognized medical practice standards within the community and the right to examine the most recent survey of the facility conducted by the State Department of Health.

20. The statutory cause of action created in 63 O.S.2001, § 1918(G) is " 'a statutory tort,' i.e. a legislatively-crafted, non-contractual duty, unknown to the common law, for the breach of which action *ex delicto* will lie." *Morgan v. Galilean Health Enterprises, Inc.,* 1998 OK 130, ¶ 8, 977 P.2d 357, 361.

21. To support its interstate commerce claim, the nursing home submitted an affidavit of its administrator, Susan Evers, stating that: the nurs-

ing home is a licensed facility receiving funds from Medicare and Medicaid; the nursing home receives periodic reviews and inspections from federal surveyors located in Dallas, Texas, and receives federal funds from federal facilities located in Omaha, Nebraska; the nursing home received funds under both the federal Medicare and Medicaid programs for Leola Bruner's nursing home care; the nursing home utilizes equipment, materials and supplies from Maryland, Illinois, Ohio and Texas; the nursing home utilized equipment, materials and supplies from out-of-state vendors in providing nursing home care to Leola Bruner; and, the nursing home sends invoices to and receives payments from California, New Jersey, Texas and Florida.

Sherman Act. The Seventh Circuit found that the nurses's allegations that the hospital served nonresident patients and received Medicare and Medicaid payments were sufficient to allege Sherman Act jurisdiction under *Summit*, but not sufficient to state a claim under the Sherman Act—a claim that the conduct would have "a not insubstantial effect upon interstate commerce." 36 F.3d at 666. In *BCB Anesthesia Care, Ltd.*, the Seventh Circuit Court explained:

> "Although we hesitate to say that [a staffing decision at one hospital] . . . can never state an antitrust claim, we believe it is incumbent upon the plaintiff to plead some additional facts from which it can be inferred that the case falls within the ambit of the Sherman Act." *Seglin v. Esau*, *supra*, [769 F.2d 1274 (7th Cir.1985)] Before we enlist this court in the micromanagement of the staffing arrangements at Passavant under the aegis of the antitrust laws, we need better reasons than the plaintiffs have given us.

*Id.* 36 F.3d at 669. This case teaches that a trivial commerce nexus may invoke Sherman Act jurisdiction, but more is needed to trigger the substantive provisions in the Sherman Act. Unlike the Sherman Act, the FAA does not invoke federal court jurisdiction. Inasmuch as the FAA is substantive law,[22] we find *BCB Anesthesia Care* inconsequential in the instant case.

¶ 34 Nursing home also argues that the Medicare connection between health care and interstate commerce was extended to nursing homes in *McGuffey Health and Rehab. Center v. Jackson*, 864 So.2d 1061 (Ala.2003), followed by *Owens v. Coosa Valley Health Care, Inc.*, 890 So.2d 983 (Ala.2004). The *McGuffey* court held that Medicare funds moving across state lines should be considered to establish the interstate commerce connection, relying on *Summit Health, Ltd., BCB Anesthesia Care, Ltd.*, and *McElhinney*. *Id.* 864 So.2d at 1063. For the reasons already discussed, we disagree that these cases support the *McGuffey* holding. *Owens* followed *McGuffey*, even though there was no proof of Medicare payments. The *Owens* court said that any doubt as to whether providing nursing home services involved interstate commerce is put to rest by the fact that the transaction is unquestionably economic in nature under *Citizens Bank* and that purely intrastate economic or commercial transactions can be within the reach of the Commerce Clause. We do not join the Alabama Supreme Court in this reading of the United States Supreme Court's *Citizens Bank* decision.

¶ 35 Nursing home also relies on *Vicksburg Partners, L.P. v. Stephens*, 911 So.2d 507 (Miss.2005), which extended *Citizens Bank* to a nursing home admission contract. Unlike the instant case, the defendants in *Vicksburg Partners* included a Georgia corporation, a Tennessee corporation and a Louisiana corporation, who collectively contributed to the operation of the nursing home. *Id.* at 515.

¶ 36 Finally, nursing home relies on *In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67 (2005). Without any analysis, *Nexion* summarily ruled that "[b]ecause 'commerce' is broadly construed, the evidence of Medicare payments made to HHC on John's behalf is sufficient to establish interstate commerce and the FAA's application in this case." *Id.* at 69. On rehearing, the Texas court left for another day consideration of reverse preemption of the FAA on insurance by the McCarran–Ferguson Act, 15 U.S.C. § 1012(b).

¶ 37 Although Medicare funds reimburse nursing homes for care, services and supplies, the Medicare program is a significant social security insurance program for the welfare of the aged and the disabled. Similarly, federal-state-matching Medicaid funds reimburse providers for care, services and supplies, but the Medicaid program is a significant medical program carried out by the states for the welfare of the needy. Congress has not declared the Medicare or Medicaid program to be economic activity the general practice of which may be regulated under the Commerce Clause. The United States Supreme Court has not decided that Medicare or Medicaid funding is an exercise of Congress' Commerce Clause power, nor

---

**22.** See note 6, *supra*.

has it decided that such payments are indicative of interstate commerce. We decline to join Alabama, Mississippi and Texas in treating the federal distribution of medicare insurance funds and state distribution of federal-state-matching medicaid funds as indicia of commerce that triggers the FAA.

¶ 38 Plaintiff presents several arguments in supporting the district court's refusal to send this controversy to arbitration. First, plaintiff argues that the nursing home is estopped from seeking enforcement of the arbitration agreement by virtue of the license that requires the nursing home to comply with the NHCA and that the nursing home waived the right to enforce the binding arbitration provision when it applied for and received the license issued pursuant to the NHCA. Waiver and estoppel, plaintiff argues, are general contract principles which exist at law and in equity for revocation.[23]

¶ 39 Plaintiff also argues that the OUAA does not mandate enforcement of the arbitration provisions. This is so, according to plaintiff, because the OUAA is general law and the NHCA is specific law that prevails over the general, citing *Hall v. Globe Life, supra*. We agree.

¶ 40 The record before us indicates that the parties selected Oklahoma law to govern the arbitration provisions. The appellate record contains only the two-page dispute resolution part of the nursing home admission contract and the signature page. The dispute resolution part (arbitration agreement) does not mention the FAA, although it acknowledges "that Oklahoma law, as well as decisions of the United States Supreme Court, favor the enforcement of valid arbitration provisions." It does, however, in at least eight different places, provide that arbitration shall be governed by Oklahoma law.[24]

¶ 41 Where, as here, Oklahoma law is the choice of law set out in the arbitration agreement, enforcement of the parties' agreement under Oklahoma law is fully consistent with the goals of the FAA. This is so even if the result is that arbitration will not go forward under Oklahoma law and even though the FAA would otherwise permit it to go forward. *Volt Information Sciences, Inc.*, 489 U.S. at 479, 109 S.Ct. at 1256. Enforcement of the arbitration agreement under Oklahoma law is also fully consistent with the federal nursing home regulation's deference to state procedural law. Under Oklahoma law, § 1–1939 of the NHCA specifically addressing the right to commence an action and to have a jury trial must govern over § 1859 of the OUAA generally requiring the enforcement of arbitration agreements. *Hall v. Globe Life, supra.*

■ ¶ 42 Finally, plaintiff argues that the FAA does not preempt and displace § 1–

**23.** The Oklahoma Trial Lawyers Association, *amicus curiae*, presents similar arguments. Because we affirm the district court's rulings that the nursing home care did not involve interstate commerce and that the arbitration agreement is unenforceable under 63 O.S.2001, § 1–1939(D) and (E), we do not address the waiver and estoppel arguments. Likewise, we need not address the argument that the arbitration agreement is unconscionable.

**24.** The following provisions in the arbitration agreement provides that Oklahoma law shall govern:

Any claim or controversy "shall be determined by submission to neutral, binding arbitration pursuant to the guidelines and requirements promulgated in the **laws of the State of Oklahoma** and subject to appropriate judicial review of arbitration proceedings as authorized by **Oklahoma law**."

"**Oklahoma law,** as well as the decisions of the United States Supreme Court, favor the enforcement of valid arbitration provisions .... [and any] dispute shall be resolved by binding arbitration, which shall be conducted by a neutral arbitrator selected in accordance with the arbitration guidelines and requirements provided under **Oklahoma law**."

Any award or "assessment of costs and attorney's fees to be in accordance with the **laws of the State of Oklahoma** as govern the nature and/or type of claim, controversy, dispute or disagreement in issue."

"The arbitrator(s) shall conduct the arbitration under the guidelines and requirements set forth in the **laws of the State of Oklahoma** ... In the event there is a discrepancy between the arbitration administrative service rules, or other arbitration administrator rules, and the requirements set forth in the **laws of the state of Oklahoma**, the requirements set forth in the **laws of the State of Oklahoma shall control**."

"The arbitrator may award any remedies **allowable by law**, and shall comply with the **laws of the State of Oklahoma** in determining said remedies."

(Bold added.)

1939 of the NHCA because 1) the nursing home admission contract does not evidence a transaction involving commerce and 2) the nursing home failed to prove that nursing home care substantially affects interstate commerce. Plaintiff argues that the evidence showing the nursing home has some transactions that affect interstate commerce is insufficient, considering that the patient was an Oklahoma resident, the nursing home is an Oklahoma limited partnership with its principal place of business in Oklahoma, and the nursing home is licensed by Oklahoma. We agree.

¶ 43 The nursing home admission contract in this case involves a profoundly local transaction—in-state nursing home care provided to an Oklahoma individual by an Oklahoma entity licensed under Oklahoma law. *Citizens Bank* fashioned a three-prong test of the reach of the Commerce Clause and the FAA upon such profoundly local activity. The FAA reaches arbitration agreements in contracts evidencing a transaction that is 1) economic activity, 2) which in aggregate is a general practice subject to control under the Commerce Clause, and 3) which in aggregate has a substantial impact on interstate commerce. We acknowledge that nursing home care for a fee is economic activity. However, this case fails the test on the second prong and on the third prong.

¶ 44 On the second prong, the local economic activity in the aggregate must be subject to regulation by Congress' Commerce Clause power. It is true that Congress exercises control over the local activity of delivery of care and treatment to residents in nursing homes through the Medicare/Medicaid statutes. Congress enacted the Medicare/Medicaid statutes through the exercise of its Spending Clause power. *See, Suter v. Artist,* 503 U.S. at 356, 112 S.Ct. at 1366. Nothing in the Medicare/Medicaid statutes indicates Congress found some overriding national concern and some substantial interstate commerce connection and therefore intended to take nursing home care out of the health and safety local concern category and place nursing home care in the interstate commerce category. *See, Perez v. United States,* 402 U.S. at 156, 91 S.Ct. at 1362.

¶ 45 On the third prong, we have already declined to treat the distribution of medicare insurance funds by a federal agency and federal-state-matching medicaid funds by a state agency as evidence of interstate commerce that triggers the FAA in this case. We recognize the federal interest in federally-funded programs; however, distribution of Medicare insurance funds by a federal agency does not evidence an effect on interstate commerce subject to federal control under the Commerce Clause and neither does the distribution of Medicaid funds by a state agency. For a large majority of the United States Supreme Court cases referenced in this opinion, we have noted the facts which the High Court found to evidence a substantial effect on interstate commerce. In comparison, the evidence of interstate commerce in this case demonstrates a *de minimus* impact on interstate commerce. The facts that the nursing home buys supplies from out-of-state vendors rather than in-state vendors and uses internet and long distance telephone lines do not demonstrate a substantial impact on interstate commerce and are insufficient to impress interstate commerce regulation upon the admission contract for residential care between the Oklahoma nursing home and the Oklahoma resident patient. See, *Maryland v. Wirtz,* 392 U.S. at 196, 88 S.Ct. at 2024.

¶ 46 Even if the nursing home's admission contract were within the broad reach of the Commerce Clause, the FAA's mandate has been overridden by a contrary congressional command. *See, Shearson/American Express, Inc. v. McMahon,* 482 U.S. at 226–227, 107 S.Ct. at 2337. Consistent with the federal statute permitting the states to devise a fair mechanism for hearing appeals on transfers and discharges of residents from nursing facilities, 42 U.S.C. § 1396r(c)(2) and (f)(3), the appeal procedure regulations provide that a resident has a right to agency hearings and judicial review as allowed by state law. 42 C.F.R. § 431.245. Under state law, the arbitration agreement is unenforceable. This result is consistent with the federal Medicare/Medicaid regulatory agency's finding of conflict between the Medicaid regulations and binding arbitration, implying

that arbitration proceedings are antithetical to the federal goal of protecting dependent nursing home patients from abuse and neglect. The district court did not err when it found § 1–1939(D) and (E) apply to this arbitration agreement and render it unenforceable.

## VII. Conclusion

¶ 47 In conclusion, we determine that the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*, does not apply to the arbitration agreement in this case for at least four reasons. First, the arbitration agreement calls for Oklahoma law to govern. Second, Congress regulates nursing homes through its spending power rather than its power over interstate commerce. Third, Congress, in its nursing home regulations, left the states to devise the appropriate administrative or judicial review of nursing home residents' claims against nursing homes. Fourth, the evidence in this case is insufficient to connect the nursing home admission contract with interstate commerce under extant jurisprudence from the United States Supreme Court. We also determine that Oklahoma's Nursing Home Care Act governs over Oklahoma's Uniform Arbitration Act in this case. We hold that the district court did not err in denying the motion to compel arbitration and stay proceeding.

**DISTRICT COURT AFFIRMED.**

ALL JUSTICES CONCUR.