Question Submitted by: Secretary Terry Cline, Ph.D., Secretary of Health and Human Services
2017 OK AG 5
Decided: 06/13/2017
Oklahoma Attorney General Opinions

Cite as: 2017 OK AG 5, __ __

 

¶0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:

In 2016, the definition of "owner" in the Nursing Home Care Act, 63 O.S.2011 & Supp.2016, §§ 1-1901-1-1943.1, was amended to include "any non-state governmental entity that has acquired and owns or leases a facility and that has entered into an agreement with the Oklahoma Health Care Authority to participate in the nursing facility supplemental payment program[.]" 63 O.S.Supp.2016, § 1-1902(16). The new definition further provides that the non-state governmental entity ("NSGE") is "authorized to obtain management services from a management services provider" and "to delegate, allocate and assign" between NSGE and provider the "compensation, profits, losses, liabilities, decision-making authority and responsibilities, including responsibility for the employment, direction, supervision and control of the facility's administrator and staff[.]" Id. 

(1) If a NSGE intends to acquire a long-term care facility and become an "owner" under 63 O.S.Supp.2016, § 1-1902(16), and to enter into a management agreement with a long-term care provider to manage the facility, would such an arrangement exempt the NSGE from the full application process required under the Long-Term Care Certificate of Need Act, 63 O.S.2011 & Supp.2016, §§ 1-850-1-859.1?

(2) In the scenario described in Question #1, would ownership transfer to the NSGE by "operation of law" pursuant to 63 O.S.2011, § 1-852(D)(1), such that the NSGE would not be required to submit either the full certificate of need application or the truncated exemption application?

I.
Background
¶1 "Nursing homes are regulated by a maze of state and federal regulations for the health, safety and welfare of the residents." Bruner v. Timberlane Manor LP, 2006 OK 90, ¶ 26, 155 P.3d 16, 25. Your questions involve the intersection of two such Acts: the Nursing Home Care Act (63 O.S.2011 & Supp.2016, §§ 1-190 -1-1943.1) and the Long-Term Care Certificate of Need Act (63 O.S.2011 & Supp.2016, §§ 1-850-1-859.1). Accordingly, before turning to our analysis, we begin with a broad overview of each Act.

A. The Nursing Home Care Act.
1. Licensing Requirements and Residents' Rights.
¶2 The Nursing Home Care Act ("NHCA") requires the State Department of Health ("Department") to "establish a comprehensive system of licensure and certification" for regulated facilities. 63 O.S.2011, § 1-1904(A). Such facilities include nursing facilities and specialized homes, as those terms are defined by the NHCA. 63 O.S.Supp.2016, § 1-1902(9). The purposes of this licensing scheme are (i) to "[p]rotect[] the health, welfare and safety of [facility] residents," (ii) to "[a]ssur[e] the accountability for reimbursed care provided in certified facilities," and (iii) to "[a]ssur[e] consistent application of uniform inspection protocols." 63 O.S.2011, § 1-1904(A); see also Estate of Hicks ex rel. Summers v. Urban East, Inc., 2004 OK 36, ¶ 33, 92 P.3d 88, 95 (recognizing the NHCA's purpose of "provid[ing] better quality care for residents of nursing homes"). If a facility owner, operator, or licensee violates the NHCA or rules promulgated thereunder, the Department is authorized to, among other things, suspend or revoke the license or take other administrative action, assess monetary penalties, and direct the Oklahoma Health Care Authority to withhold vendor payments to the facility until it is brought into compliance. 63 O.S.2011, § 1-1914.1(A).
¶3 Separate from its licensure and certification requirements, the NHCA in Section 1-1918 "enumerates the rights and responsibilities of residents, commonly referred to as the Nursing Home Patients' Bill of Rights." Bruner, 2006 OK 90, ¶ 29, 155 P.3d at 27. These rights include, among other things, "the right to receive adequate and appropriate medical care consistent with established and recognized medical practice standards within the community," see 63 O.S.2011, § 1-1918(B)(5), and together "shape the standard of care to govern in the nursing home setting." Morgan v. Galilean Health Enterprises, Inc., 1998 OK 130, ¶ 9, 977 P.2d 357, 362. A violation of Section 1-1918 is a misdemeanor subject to fines and up to 30 days in jail, but may also give rise to a private right of action by a resident. See 63 O.S.2011, § 1-1918(E), (F); Fanning v. Brown, 2004 OK 7, ¶ 5, 85 P.3d 841, 845. These rights are "enforceable against '[t]he owner and licensee [who] are liable to a resident for any intentional or negligent act or omission of their agents or employees which injures the resident.'" Fanning, 2004 OK 7, ¶ 5, 85 P.3d at 845. (quoting 63 O.S.Supp.2003, § 1-1939(A)) (alteration in original).

2. Regulated Entities under the Nursing Home Care Act.
¶4 The NHCA regulates licensees and applicants for licenses, facility owners, and specifically-defined facilities. State ex rel. Dept. of Health v. Robertson, 2006 OK 99, ¶ 12, 152 P.3d 875, 878. Under the NHCA, a "licensee" is defined as "the person, a corporation, partnership, or association who is the owner of the facility which is licensed by the Department pursuant to the provisions of the [NHCA]." 63 O.S.Supp.2016, § 1-1902(13); see also OAC 310:675-3-1.1(c) ("The facility owner shall be the applicant for the license[.]").
¶5 Prior to 2016, the NHCA defined "owner" as follows:
"Owner" means a person, corporation, partnership, association, or other entity which owns a facility or leases a facility. The person or entity that stands to profit or lose as a result of the financial success or failure of the operation shall be presumed to be the owner of the facility.
63 O.S.Supp.2016, § 1-1902(16). As mentioned in your question above, the Legislature amended this definition during the 2016 session to add the following language:
Notwithstanding the foregoing, any nonstate governmental entity that has acquired and owns or leases a facility and that has entered into an agreement with the Oklahoma Health Care Authority to participate in the nursing facility supplemental payment program ("UPL Owner") shall be deemed the owner of such facility and shall be authorized to obtain management services from a management services provider ("UPL Manager"), and to delegate, allocate and assign as between the UPL Owner and UPL Manager, compensation, profits, losses, liabilities, decision-making authority and responsibilities, including responsibility for the employment, direction, supervision and control of the facility's administrator and staff.
63 O.S.Supp.2016, § 1-1902(16). While not explicitly defined anywhere else in the NHCA, the designations of "UPL Owner" and "UPL Manager" are an apparent reference to the Upper Payment Limit, a maximum reimbursement rate under federal Medicaid regulations for various inpatient and outpatient services provided at various government- and privately-owned care facilities. See, e.g., 63 O.S.Supp.2016, § 3241.2(8). It is this amendment that may, in some scenarios, intersect with provisions of the Long-Term Care Certificate of Need Act.

B. The Long-Term Care Certificate of Need Act.
¶6 In the Long-Term Care Certificate of Need Act (the "Act") the Legislature declared that, as a matter of public policy, "the offering and development of long-term care services should be made in a planned, orderly and economical manner consistent with and appropriate to services needed by people in various regions, districts or localities in the State[.]" 63 O.S.2011, § 1-851. Consequently, "[e]very entity desiring to establish a new long-term care facility, to expand an existing facility..., or to acquire an existing long-term care facility shall make application to [the Department] for a certificate of need." Id. § 1-852(A); see also id. § 1-851.3 ("No long-term care facility shall be developed, acquired or offered unless a certificate of need therefor has been issued[.]"). Generally, a certificate of need will be issued only if the proposed action is economically feasible[1] and would provide necessary and desirable long-term care services, and contribute to the orderly development of such services, in the locality at issue. See id. § 1-853(A). Moreover, the applicant must be or employ a licensed nursing home administrator and have a record of compliance with applicable long-term care facility regulations. See id.
¶7 Due to the nature and complexity of the application process, obtaining a certificate of need can be a lengthy and expensive undertaking. See, e.g., Okla. Dept. of Health v. Medi-Plex Nursing Centers, Inc., 1994 OK CIV APP 18, ¶ 9, 875 P.2d 437, 439 (recognizing that "an application for a certificate of need for a new long-term care facility under § 1-852(A) is long and arduous"). However, the Act provides two avenues for applicants to comply with the statute without submitting to the full certificate of need process.
¶8 First, certain applicants may receive an exemption from the full application process under Section 1-852(C). Applicants for an exemption still must submit an application to the Department, but the process is not as lengthy as it would be for a certificate of need. The specific exemption relevant to your request is set forth in Section 1-852(C)(3), which provides as follows:
C. The Department within fifteen (15) days after receipt of an application shall issue an exemption from certificate of need requirements upon written request and demonstration that applicable exemption criteria have been met, for any of the following activities:
3. A management agreement if:

a. the management entity discloses all persons with controlling interest in the management entity and discloses all experience in long-term care facility management or operation in any state during the preceding thirty-six (36) months,
b. the management entity and any person with controlling interest if the management entity has less than thirty-six (36) months experience in management or operation of facilities, does not have a history of noncompliance, and
c. the licensed entity remains responsible for facility operation, financial performance, staffing and delivery of resident services required under the Nursing Home Care Act.
63 O.S.2011, § 1-852(C) (emphasis added). For the purposes of the scenario outlined in your request, we understand that the "management entity"-as used in subparagraphs (a) and (b)-would be the management services provider, or "UPL Manager" under the NHCA. However, the "licensed entity"-as used in subparagraph (c)-would be the non-state governmental entity, or "UPL Owner" under the NHCA. Our reasoning for reaching this understanding is set forth in more detail in Section II.A infra.
¶9 Second, there are circumstances in which a certificate of need is unnecessary and the Act therefore does not require an application at all. One such provision is relevant to your second question:
D. A certificate of need shall not be required for:
1. Any changes of ownership resulting from the operation of law, including but not limited to divorce, probate, reversions and bankruptcy if the transfer of interest is to any already existing stockholder or person or entity listed on the license application disclosure statement.
63 O.S.2011, § 1-852(D)(1).
¶10 Having reviewed the purposes and relevant provisions of the Nursing Home Care Act and the Long-Term Care Certificate of Need Act, we now turn to your questions.

II. 
Discussion
¶11 We begin our analysis with a recitation of the scenario you describe in your request. In that scenario, a non-state governmental entity ("NSGE") intends to acquire a long-term care facility and enter into an agreement with the Oklahoma Health Care Authority to participate in the nursing facility supplemental payment program, thus becoming an "owner" under the NHCA. See 63 O.S.Supp.2016, § 1-1902(16). The NSGE also intends to enter into a management agreement with a licensed long-term care provider to take on some degree of the day-to-day operations of the facility, as specifically authorized under the NHCA. See id. Normally, the NSGE's proposed acquisition would be conditioned on it first obtaining a certificate of need. See 63 O.S.2011, § 1-852(A) ("Every entity desiring to...acquire an existing long-term care facility shall make application to [the Department] for a certificate of need."). However, you ask whether this particular arrangement would either (i) qualify for the "management agreement" exemption under Section 1-852(C), or (ii) amount to a "change[] in ownership resulting from the operation of law" under Section 1-852(D), such that no certificate of need is required at all.

A. To qualify for a certificate of need exemption by entering into a management agreement, a NSGE must retain the level of operational and financial control over the facility required by 63 O.S.2011, § 1-852(C)(3)(c).
¶12 As noted above, in cases where the Department receives a certificate of need application that includes a written request for an exemption and a showing that the relevant criteria are met, the exemption shall be issued. 63 O.S.2011, § 1-852(C). One such exemption involves the applicant entering into a management agreement under Section 1-852(C)(3). As an initial matter, we have no reason to believe that a "management agreement" for the purposes of this exemption is somehow different than an agreement to "obtain[] management services from a management services provider" as that phrase is used in the definition of "owner" under the NHCA. To the contrary, the statutes regulate interrelated-and sometimes overlapping-areas of long-term care facility operations and, as with all statutes, "must be construed as a consistent whole in harmony with common sense and reason[.]" Cowart v. Piper Aircraft Corp., 1983 OK 66, ¶ 4, 665 P.2d 315, 317.
¶13 Thus, to determine whether the management agreement between the NSGE and the services provider meets the exemption criteria of Section 1-852(C)(3), we look to the exemption's three general requirements. First, the "management entity" must identify persons having a controlling interest in the entity and disclose its experience in operating long-term care facilities in any state over the prior three years. 63 O.S.2011, § 1-852(C)(3)(a). Second, the "management entity" or those with a controlling interest in the entity must "not have a history of noncompliance[.]" Id. § 1-852(C)(3)(b). Third, "the licensed entity [must] remain[] responsible for facility operation, financial performance, staffing and delivery of resident services required under the Nursing Home Care Act." Id. § 1-852(C)(3)(c) (emphasis added). Neither of the first two requirements are relevant to this opinion and we therefore assume for our purposes that they have been satisfied. The third requirement, however, warrants further discussion.
¶14 The third prong of Section 1-852(C)(3) requires the licensed entity-not the management entity-to be the entity responsible for facility operation, financial performance, staffing, and delivery of resident services as required under the NHCA. For facilities regulated under the NHCA, the licensee is the owner of the facility, see 63 O.S.Supp.2016, § 1-1902(13) and OAC 310:675-3-1.1(c), which in this scenario would be the NSGE. Thus, while Section 1-1902(16) of the NHCA gives broad authority to the NSGE as UPL Owner to "delegate, allocate and assign as between the UPL Owner and UPL Manager, compensation, profits, losses, liabilities, decision-making authority and responsibilities, including responsibility for the employment, direction, supervision and control of the facility's administrator and staff," it would appear that the NSGE would have to retain much of the facility's operational and financial responsibility for the NSGE's acquisition to be exempt from the full certificate of need process.
¶15 In sum, if the management agreement between the NSGE, as "UPL Owner," and the "UPL Manager" provides that the NSGE "remains responsible for facility operation, financial performance, staffing and delivery of resident services required under the [NHCA]" and the other statutory criteria are satisfied, then the NSGE's acquisition in the scenario you describe would be exempt from the full certificate of need application process. See 63 O.S.2011, § 1-852(C)(3). However, the question of whether any particular arrangement between a NSGE and a management services provider will satisfy the "management agreement" exemption is beyond the scope of this opinion.
B. If a non-state governmental entity acquires a long-term care facility and is deemed an owner under 63 O.S.Supp.2016, § 1-1902(16), the facility has not changed ownership by "operation of law."
¶16 In some cases, an entity seeking to acquire a long-term care facility need not apply for a certificate of need nor an exemption. Specifically, Section 1-852(D) provides, in relevant part:
D. A certificate of need shall not be required for:
1. Any changes of ownership resulting from the operation of law, including but not limited to divorce, probate, reversions and bankruptcy if the transfer of interest is to any already existing stockholder or person or entity listed on the license application disclosure statement. This shall also include cancellations and expirations of leases. Operational law ownership changes shall be reported to the Department within five (5) working days of the change[.]
63 O.S.2011, § 1-852(D)(1) (emphasis added). Thus, where a change in ownership occurs by "operation of law," the acquiring entity need only report the change in ownership and is excused from both the full certificate of need application as well as the shorter exemption requirements under Section 1-852(C). You ask whether, in the scenario you describe above, the NSGE being "deemed the owner of such facility" under Section 1-1902(16) would be akin to a change of ownership "resulting from the operation of law" under Section 1-852(D)(1). To answer this question, we look to the plain meaning of the phrase "operation of law." See Hurst v. Empire, 1993 OK 47, ¶ 18, 852 P.2d 701, 706 ("In the absence of a contrary definition, we must assume that the legislature intended the words used to have the meaning attributed to them in ordinary and usual parlance.").
¶17 The phrase "operation of law" is a legal term used to describe "a legal outcome that automatically occurs whether or not the affected party intends it to." Black's Law Dictionary 895 (7th ed. 2000). For instance, where a prescription statute provides that mineral rights expire and revert to the government after ten years of nonuse, "[t]he change in ownership was effectuated by operation of law, not by any means used by the [government]." Central Pines Land Co. v. U.S., 61 Fed. Cl. 527, 531 (2004).
¶18 This understanding of the term "operation of law" is confirmed by the language of Section 1-852(D)(1) itself, which gives a non-exhaustive list of situations where a "change[] of ownership result[s] from the operation of law." The four examples include "divorce, probate, reversions and bankruptcy," all of which involve situations where a transfer of ownership would occur automatically.[2] Because of the non-exhaustive list of occurrences found in the statute, the doctrine of ejusdem generis[3] is helpful to an examination of the question. In White v. Wint, the Oklahoma Supreme Court explained that this doctrine applies where:
(1) the statute contains an enumeration of specific words; (2) the members of the enumeration constitute a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires.

White v. Wint, 1981 OK 154, ¶ 9, 638 P.2d 1109, 1113-14 (quoting 2A Sutherland Statutes and Statutory Construction § 47.18, at 109 (Sands 4th ed. 1973)). Where ejusdem generis applies, "'the meaning of the general words will be ordinarily presumed to be restricted by the particular designation [of subjects or classes of persons enumerated in the statute] and to include only things or persons of the same kind, class, or nature as those specifically enumerated, unless
¶19 there is a clear manifestation of a contrary purpose.'" Id. (quoting Walton v. Donnelly, 1921 OK 258, 201 P. 367, 369) (alterations in original).
¶20 Based on the foregoing, we conclude that in the scenario you describe, the NSGE would not become the owner of the facility by "operation of law." In contrast to situations where transfer of ownership "automatically occurs whether or not the affected party intends it to," see Black's Law Dictionary 895, the NSGE must both "acquire[] and own[] or lease[] a facility" and "enter[] into an agreement with the Oklahoma Health Care Authority to participate in the nursing facility supplemental payment program" in order to be "deemed the owner of such facility[.]" 63 O.S.Supp.2016, § 1-1902(16). Each is a volitional act on the part of the NSGE and, as such, the change in ownership is in no way automatic.
¶21 This conclusion finds further support in the reporting requirement of Section 1-852(D)(1): "Operational law ownership changes shall be reported to the Department within five (5) working days of the change[.]" 63 O.S.2011, § 1-852(D)(1). This requirement to report after taking ownership contemplates a scenario in which the new owner does not have control over the timing of taking ownership, but passively takes ownership following, for example, a court decree or the expiration of a lease. By contrast, a NSGE that acquires a facility and enters into an agreement with the Oklahoma Health Care Authority to participate in the nursing facility supplemental payment program does have control over the timing of the transaction. As such, the NSGE has control over the timing of becoming an "owner" under Section 1-1902(16), and it is not an automatic transfer of ownership that results from the operation of law.

¶22 It is, therefore, the official Opinion of the Attorney General that:
1. Under 63 O.S.Supp.2016, § 1-1902(16), a non-state governmental entity that "has acquired and owns or leases a [long-term care] facility and that has entered into an agreement with the Oklahoma Health Care Authority to participate in the nursing facility supplemental payment program" is deemed to be the owner of the facility.
2. A non-state governmental entity that is deemed a facility owner under 63 O.S.Supp.2016, § 1-1902(16) may also "obtain management services from a management services provider" and "delegate, allocate and assign" between the owner and provider "compensation, profits, losses, liabilities, decision-making authority and responsibilities, including responsibility for employment, direction, supervision and control of the facility's administrator and staff." 
3. By entering into an agreement with a management services provider pursuant to 63 O.S.Supp.2016, § 1-1902(16), the non-state governmental entity would qualify for an exemption from the Long-Term Care Certificate of Need Act only if it complies with 63 O.S.2011, § 1-852(C)(3), which, among other things, requires the facility owner to "remain[] responsible for facility operation, financial performance, staffing and delivery of resident services required under the Nursing Home Care Act."
4. A non-state governmental entity that acquires a long-term care facility and becomes an "owner" under 63 O.S.Supp.2016, § 1-1902(16) does not gain ownership "resulting from the operation of law" and therefore would not qualify for the exclusion from the Long-Term Care Certificate of Need Act pursuant to 63 O.S.2011, § 1-852(D)(1).

Mike Hunter
Attorney General of Oklahoma
Theodore M. Peeper
Assistant Attorney General

FOOTNOTES
[1] Indeed, under Department rules an applicant must show proof of financial resources to complete the acquisition, a projected budget, balance sheets, and financial proof for services and staffing. OAC 310:620-3-1.
[2] Section 1-852(D)(1) gives a further example, "cancellations and expirations of leases" which is a type of reversion. 63 O.S.2011, § 1-852(D)(1).
[3] The term ejusdem generis refers to "the ordinary insight that when specific words are followed by general words those specific words restrict the meaning of the general." State ex rel. Comm'rs of Land Office v. Butler, 1987 OK 123, ¶ 8, 753 P.2d 1334, 1336.

 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
1994 OK CIV APP 18, 875 P.2d 437, 65 OBJ 1893, 
Oklahoma Dept. of Health v. Medi- Plex Nursing Centers, Inc.
Discussed

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1987 OK 123, 753 P.2d 1334, 58 OBJ 3412, 
State ex rel. Com'rs of Land Office v. Butler
Discussed

 
1993 OK 47, 852 P.2d 701, 64 OBJ 1270, 
Hurst v. Empie
Discussed

 
1921 OK 258, 201 P. 367, 83 Okla. 233, 
WALTON v. DONNELLY
Discussed

 
2004 OK 7, 85 P.3d 841, 
FANNING v. BROWN
Discussed at Length

 
2004 OK 36, 92 P.3d 88, 
ESTATE OF HICKS v. URBAN EAST, INC.
Discussed

 
2006 OK 90, 155 P.3d 16, 
BRUNER v. TIMBERLANE MANOR LIMITED PARTNERSHIP
Discussed at Length

 
2006 OK 99, 152 P.3d 875, 
STATE ex rel. OKLA. STATE DEPT. OF HEALTH v. ROBERTSON
Discussed

 
1981 OK 154, 638 P.2d 1109, 
White v. Wint
Discussed

 
1998 OK 130, 977 P.2d 357, 70 OBJ 59, 
Morgan v. Galilean Health Enterprises, Inc.
Discussed

 
1983 OK 66, 665 P.2d 315, 
Cowart v. Piper Aircraft Corp.
Discussed

Title 63. Public Health and Safety

 
Cite
Name
Level

 
63 O.S. 1-1939, 
Liability to Residents - Injunctive and Declaratory Relief - Damages - Waiver of Rights - Jury Trial - Retaliation Against Residents - Immunity - Report of Abuse or Neglect
Cited

 
63 O.S. 1-852, 
Certificate of Need - Application - Requirements - Procedures
Discussed at Length

 
63 O.S. 1-1902, 
Definitions
Discussed at Length

 
63 O.S. 3241.2, 
Definitions
Cited

 
63 O.S. 1-851, 
Public Policy
Cited

 
63 O.S. 1-1904, 
Licensure and Certification - Purpose - Procedure - Violations - Applications
Discussed

 
63 O.S. 1-1918, 
Rights and Responsibilities
Discussed