Cite as 2024 Ark. App. 596

# ARKANSAS COURT OF APPEALS
### DIVISION III
No. CV-23-533

| | |
|---|---|
| HEATHER MANOR CARE CENTER, INC.; AND MICHAEL MORTON<br>APPELLANTS<br><br>V.<br><br>JAMES MARSHALL, DECEASED, BY HIS SPECIAL ADMINISTRATOR, TRINA ELLIS<br>APPELLEE | Opinion Delivered December 4, 2024<br><br>APPEAL FROM THE HEMPSTEAD COUNTY CIRCUIT COURT<br>[NO. 29CV-20-27]<br><br>HONORABLE DUNCAN CULPEPPER, JUDGE<br><br>REVERSED |

## CINDY GRACE THYER, Judge

Heather Manor Care Center ("Heather Manor") appeals from an order of the Hempstead County Circuit Court denying its motion to compel arbitration in a nursing-home medical-negligence case. Heather Manor argues that the circuit court erred in finding that the Federal Arbitration Act (FAA) does not apply; that appellee Trina Ellis signed the arbitration agreement in her individual capacity; and that the power of attorney executed by appellee James Marshall was invalid. We agree and reverse and remand.

### I. *Factual and Procedural Background*

James Marshall was admitted to Heather Manor in April 2017. As part of the admissions process, Ellis, his daughter, signed several documents, including an admission agreement and an arbitration agreement. The arbitration agreement was a condition of

admission, and it provided that "any and all claims, disputes, and controversies arising out of, or in connection with, or relating in any way to the Admission Agreement, or any service or health care provided by the Facility to the Resident, that would constitute a cause of action in a court of law . . . shall be resolved exclusively by binding arbitration and not by a lawsuit or resort to court process."

Ellis signed the admission agreement as "Resident's Responsible Party." "Resident's Responsible Party" was defined in the agreement as, among other things, "the Resident's attorney-in-fact, if the Resident has executed a power of attorney." Ellis likewise signed the arbitration agreement as "Responsible Party" and indicated that her relationship to the resident was "Daughter." In addition, she checked a blank on the arbitration agreement that stated the following: "A copy of my guardianship papers, durable power of attorney, or other documentation has been provided to the Facility and is attached."

Marshall died on March 7, 2018. On March 2, 2022, Ellis, as special administrator of Marshall's estate, filed a complaint against Heather Manor alleging claims of medical negligence, ordinary negligence, violation of the Nursing Home Resident Rights Act, breach of fiduciary duty, and wrongful death. Heather Manor answered Ellis's complaint, generally denying her claims and specifically denying that jurisdiction and venue were proper in the circuit court because her claims were barred from being litigated in court "by virtue of an arbitration agreement executed on behalf of Mr. Marshall."

Heather Manor subsequently moved to compel arbitration. It asserted that Ellis executed paperwork in connection with Marshall's admission to Heather Manor, and as part

2

of the admission process, Ellis received and signed both the admission agreement and the arbitration agreement. Heather Manor argued that Ellis had the authority to enter into the admission agreement and arbitration agreement on her father's behalf pursuant to a durable power of attorney executed by Marshall in March 2017, a copy of which it attached to its motion.[1] Moreover, in its brief in support of its motion to compel, Heather Manor specifically asserted that the FAA governs arbitration in this case and preempts any Arkansas law to the contrary.

Ellis responded to Heather Manor's motion, pointing out numerous inconsistencies in the identification of the parties to the agreements. She further argued that Heather Manor had not authenticated the power of attorney, noting that the copy attached to its motion did not bear Marshall's signature. She also denied that the Federal Arbitration Act applied, and she argued that the arbitration agreement was unenforceable under Arkansas law. Finally, she contended that the manner in which the agreements were executed rendered them unenforceable, pointing out ambiguities regarding the parties and signatories to the agreements.

---

[1]The power of attorney granted to Ellis by Marshall gave her generally the "full power to act for me and in my name in all matters and to do all things which I could do if personally present and acting in my own behalf." The power of attorney also specifically granted Ellis the power, among other things, "[t]o institute, compromise, settle, defend, appear in, appeal, give bond in and engage counsel to represent me in all legal proceedings in which at any time I may have any interest." Unless a power of attorney provides otherwise, language in a power of attorney granting general authority with respect to claims and litigation authorizes the agent to submit to alternative dispute resolution. Ark. Code Ann. § 28-68-212(5) (Repl. 2012).

Following a hearing, the circuit court entered an order denying Heather Manor's motion to compel arbitration. The court found, without elaboration, that the arbitration agreement was signed by Ellis in her individual capacity and not as Marshall's attorney-in-fact; that the power of attorney purportedly executed by Marshall was invalid; and that the FAA did not apply to this case. Heather Manor filed a timely notice of appeal and now assigns error to each of the circuit court's rulings.

II. *Standard of Review and Applicable Law Regarding Arbitration Agreements*

An order denying a motion to compel arbitration is immediately appealable pursuant to Arkansas Rule of Appellate Procedure–Civil 2(a)(12). We review a circuit court's denial of a motion to compel arbitration de novo on the record. *Nursing & Rehab. Ctr. at Good Shepherd, LLC v. White*, 2024 Ark. App. 307, 689 S.W.3d 684. While we are not bound by the circuit court's decision, in the absence of a showing that the circuit court erred in its interpretation of the law, we will accept its decision as correct on appeal. *Id.*

When a court is asked to compel arbitration, it is limited to deciding two threshold questions: (1) whether there is a valid agreement to arbitrate between the parties, and (2) if such an agreement exists, whether the dispute falls within its scope. *Asset Acceptance, LLC v. Newby*, 2014 Ark. 280, 437 S.W.3d 119. The threshold issue is whether there was a valid arbitration agreement. *Pines ‑ Progressive Eldercare Servs., Inc. v. Carnahan*, 2024 Ark. App. 138, 686 S.W.3d 524. We are also guided by the legal principle that contractual agreements are construed against the drafter. *Colonel Glenn Health & Rehab., LLC v. Aldrich*, 2020 Ark. App. 222, 599 S.W.3d 344.

4

This court looks to state contract law to determine if the parties' agreement is valid. *GGNSC Holdings, LLC v. Chappel*, 2014 Ark. 545, 453 S.W.3d 645. In Arkansas, the essential elements for an enforceable arbitration agreement are (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligation. *Bank of the Ozarks, Inc. v. Walker*, 2014 Ark. 223, 434 S.W.3d 357. Heather Manor, as the proponent of the arbitration agreement, has the burden of proving these essential elements. *See Robinson Nursing & Rehab. Ctr., LLC v. Phillips*, 2019 Ark. 305, 586 S.W.3d 624.

III. *Discussion*

A. Applicability of the Federal Arbitration Act

In its first point on appeal, Heather Manor argues that the circuit court erred in finding that the FAA is not applicable in this case. The FAA, § 2 states the following:

> A written provision in . . . *a contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract [or] transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added). In *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265 (1995), the Supreme Court stated that "the basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate" and held that the Act was to have an "expansive interpretation" in order to reach all transactions or contracts that fall within the broad scope of Congressional powers relating to interstate commerce. *Allied-Bruce*, 513 U.S. at 274. The Court in *Allied-Bruce* explained that the words "involving commerce"

5

were intended to be read broadly to mean "affecting commerce." *Id.* at 273–74. "The word 'involving,' like 'affecting,' signals an intent to exercise Congress's commerce power to the full." *Id.* at 277. It further concluded that the phrase "involving commerce" meant that the transaction must "in fact 'involv[e]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." *Id.* at 281.

The Court expounded on its interpretation of the FAA in *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003), holding that "Congress's Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent a 'general practice . . . subject to federal control.' Only that general practice need bear on interstate commerce in a substantial way." *Id.* at 57 (citations omitted) (quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)).

Although no Arkansas case has squarely addressed the specific question presented in this appeal,[2] nearly all jurisdictions that have considered whether a nursing-home arbitration agreement "involves interstate commerce" have concluded that it does. In *Maide, LLC v.*

---

[2]Although no Arkansas case seems to have squarely addressed the question whether a nursing-home arbitration agreement "involves interstate commerce," numerous cases have seemingly acknowledged the applicability of the FAA to nursing-home contracts. *See, e.g.*, *Phillips*, 2019 Ark. 305, 586 S.W.3d 624 (parties did not dispute applicability of FAA in a nursing-home negligence case); *Courtyard Gardens Health & Rehab., LLC v. Arnold*, 2016 Ark. 62, 485 S.W.3d 669 (parties agreed that the FAA governed the arbitration agreement in a nursing-home negligence and malpractice case).

*DiLeo for DiLeo*, the Nevada Supreme Court authored a comprehensive survey of the caselaw

on this issue, writing as follows:

> We have never addressed the FAA's application in the context of care- or nursing-home contracts. But the South Carolina Supreme Court noted that following *Allied-Bruce*, most, if not all, courts have concluded that nursing home residency contracts implicate interstate commerce, as such "contracts usually entail providing residents with meals and medical supplies that are inevitably shipped across state lines from out-of-state vendors." *Dean v. Heritage Healthcare of Ridgeway, LLC*, 408 S.C. 371, 759 S.E.2d 727, 732 (2014). Similarly, the Kentucky Supreme Court noted that many courts have applied the FAA to arbitration provisions in nursing-home contracts and that health care is an activity that, in the aggregate, represents a general practice subject to federal control. *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 589-90 (Ky. 2012).
>
> These and other cases across the country show that residency home contracts implicate the FAA where they regard supplies that are shipped across state lines or involve the use of federal funding. In *McGuffey Health & Rehabilitation Center v. Gibson*, for example, the Alabama Supreme Court concluded a nursing home engaged in interstate commerce by accepting Medicare for the patient's care and treatment and by purchasing goods used for the patient's care from other states. 864 So. 2d 1061, 1062–63 (Ala. 2003). The Georgia Court of Appeals concluded a nursing home engaged in interstate commerce by purchasing supplies from vendors in other states, treating patients from other states, and having patients insured through Medicare and private insurances located in other states. *Triad Health Mgmt. of Ga., III, LLC v. Johnson*, 298 Ga. App. 204, 679 S.E.2d 785, 787–88 (2009). An Illinois court determined a contract involved interstate commerce where Medicare paid for the patient's care and the facility received food, oxygen tanks, beds, and other supplies from vendors in other states, as well as provided services from companies situated in other states and used an out-of-state company to process its payroll. *Carter v. SSC Odin Operating Co.*, 353 Ill. Dec. 422, 955 N.E.2d 1233, 1239 (Ill. App. Ct. 2011), reversed in part on other grounds by *Carter v. SSC Odin Operating Co.*, 364 Ill. Dec. 66, 976 N.E.2d 344 (Ill. 2012). Similarly, a New Jersey court concluded that several nursing facilities that purchased supplies from out-of-state suppliers engaged in interstate commerce. *Estate of Ruszala v. Brookdale Living Cmtys., Inc.*, 415 N.J. Super. 272, 1 A.3d 806, 817 (2010); *see also THI of N.M. at Hobbs Ctr., LLC v. Spradlin*, 893 F. Supp. 2d 1172, 1184 (D.N.M. 2012) (concluding a care facility engaged in interstate commerce by accepting Medicare patients and purchasing medical and office supplies and furniture across state lines), aff'd 532 F. App'x 813 (10th Cir. 2013); *Pickering v.*

*Urbantus, LLC*, 827 F. Supp. 2d 1010, 1014 (S.D. Iowa 2011) (concluding the FAA applied where the facility purchased medical equipment, laundry supplies, food, and medical supplies from other states and where the parties were located in different states). Furthermore, even where the funding comes through Medicaid or another state medical assistance program, if the program is federally funded, a contract that utilizes those funds implicates interstate commerce and falls under the FAA. *In re Dec. Nine Co.*, 225 S.W.3d 693, 697–98 (Tex. App. 2006) (concluding a contract involved interstate commerce and fell within the FAA where one party received federal funds through the state-run Medicaid program).

504 P.3d 1126, 1130.

For her part, Ellis cites a single case in opposition: *Bruner v. Timberland Manor Ltd. P'ship*, 155 P.3d 16 (Okla. 2007). That case rejected application of the FAA because "[t]he nursing home admission contract in this case involves a profoundly local transaction––in-state nursing home care provided to an Oklahoma individual by an Oklahoma entity licensed under Oklahoma law." *Id.* at 31. An Oklahoma appellate court subsequently recognized, however, that *Bruner*'s holding was inconsistent with the United States Supreme Court ruling in *Marmet Health Care Center v. Brown*, 565 U.S. 530 (2012), and declined to follow that case's holding. *Weaver v. Doe*, 371 P.3 1170 (Okla. Civ. App. 2016).

It is apparent that the greater weight of authority addressing nursing-home admission agreements like the one at issue here has determined that these agreements involve interstate commerce and thus implicate the FAA. Although Heather Manor presented no evidence regarding, for example, its purchases of supplies through interstate commerce, its admission agreement nonetheless establishes that the facility is certified to participate in both Medicaid and Medicare programs. This was sufficient to trigger application of the FAA in cases such as *Owens v. Coosa Valley Health Care, Inc.*, 890 So. 2d 983 (Ala. 2004) (explaining that a

8

contract involved interstate commerce when a substantial portion of the funding for the nursing home came from federally funded Medicaid or Medicare), and *Visiting Nurse Association of Florida, Inc. v. Jupiter Medical Center, Inc.*, 154 So. 3d 1115 (Fla. 2014) (explaining a contract involved interstate commerce where it contemplated the referral of Medicare patients, even though the record showed no other evidence of interstate commerce). Accordingly, we hold that the FAA is applicable to the nursing-home contract between Heather Manor and Marshall.

### B. Execution of the Admission and Arbitration Agreements

In its second point on appeal, Heather Manor argues that the circuit court erred in determining that Ellis signed the admission and arbitration agreements in her individual capacity. Ellis responds that the manner in which the agreements were executed rendered them ambiguous and therefore unenforceable.

When a third party signs an arbitration agreement on behalf of another, as was done in this case, the court must determine whether the third party was clothed with authority to bind the other person to arbitration. *Nursing & Rehab. Ctr. at Good Shepherd, LLC v. White*, 2024 Ark. App. 307, 689 S.W.3d 684. Agency is not presumed, and if there is uncertainty or ambiguity in an agreement, or it is susceptible to more than one reasonable construction, our courts construe it most strongly against the party who drafted it. *Id.* The burden of proving an agency relationship lies with the party asserting its existence. *Id.* Not only must the agent agree to act on the principal's behalf and subject to his or her control, but the principal must also indicate that the agent is to act for him or her. *Id.*

9

Heather Manor argues that the agreements that Ellis signed clearly demonstrated that she had the authority to act on behalf of her father. Ellis signed both the admission agreement and the arbitration agreement as "Resident's Responsible Party." As noted above, the admission agreement defined the "Resident's Responsible Party" as "the Resident's legal guardian, if one has been appointed, *the Resident's attorney-in-fact, if the Resident has executed a power of attorney*, or some other individual or family member who agrees to assist the Facility in providing for the Resident's health, care, and maintenance." (Emphasis added.) Of critical importance, Ellis checked the box next to the statement "[a] copy of my guardianship papers, durable power of attorney, or other documentation has been provided to the Facility and is attached."[3]

Ellis relies heavily on *Innisfree Health & Rehab, LLC v. Titus*, 2021 Ark. App. 403, 636 S.W.3d 781, and *Innisfree Health & Rehab, LLC v. Jordan*, 2020 Ark. App. 518, 2020 Ark. App. 518, in support of her argument that she lacked the authority to bind Marshall to the arbitration agreement. In both of those cases, the spouse of the nursing-home admittee signed the admission and arbitration agreements on behalf of the patient as "Responsible Party" and as "Spouse." Both spouses possessed powers of attorney. In both cases, this court affirmed the circuit court's denial of the nursing home's motion to compel arbitration

---

[3]Although the copy of the power of attorney attached to Heather Manor's motion to compel arbitration did not include a signature block, Heather Manor subsequently filed a copy of the document bearing Marshall's signature. The validity of Marshall's signature is addressed below.

because there was no evidence that either of the spouses had signed the agreements in a representative capacity.

The reason for this court's conclusion in both cases was the fact that neither spouse had checked the box on the arbitration agreement reflecting that a copy of their power of attorney had been provided to the nursing home. The *Titus* court explained its holding with a citation to *Jordan*, writing as follows:

> In *Innisfree v. Jordan*, the resident, Kenneth Jordan, executed a power of attorney in favor of his wife, Reba Jordan. As in the present case, the arbitration agreement identified Reba as the resident's "Responsible Party," and it was signed by Reba as the resident's "Spouse." Moreover, as in the present case, the agreement in *Innisfree v. Jordan* contained a space—*which was left blank*—that was to be checked if applicable if the Responsible Party provided the facility with a copy of a power of attorney, guardianship papers, or other legal documents.

> The trial court in *Innisfree v. Jordan* found the arbitration agreement unenforceable because Reba signed the arbitration agreement in her capacity as Kenneth's spouse—not his power of attorney (*although she held a valid power of attorney*)—and that the nursing home did not check the box indicating that a power of attorney had been provided. Our court affirmed the trial court in *Innisfree v. Jordan*, stating that there was no clear indication anywhere in the arbitration agreement to demonstrate whether Reba was signing in an individual capacity or in a representative capacity, and that neither party marked the space indicating that Reba was acting pursuant to any legal authority, such as a guardianship or power of attorney. We wrote:

>> When a third party signs an arbitration agreement on behalf of another, as was done in this case, the court must determine whether the third party was clothed with authority to bind the other person to arbitration. Nowhere does the arbitration agreement indicate that Reba Jordan signed as her husband's power of attorney or that she had any legal authority to bind him. Agency is not presumed, and if there is uncertainty or ambiguity in an agreement, or it is susceptible to more than one reasonable construction, our courts construe it most strongly against the party who drafted it.

>> Because we hold that there is an ambiguity in the agreement before us, we construe the contract most strongly against the appellants and affirm the

11

> circuit court's conclusion that Reba Jordan did not sign in a representative capacity with the legal authority to bind Mr. Jordan.

*Innisfree v. Jordan*, 2020 Ark. App. 518, at 5–6.

*Titus*, 2021 Ark. App. 403, at 7–9 (internal citations omitted).

The *Titus* court also rejected the nursing home's argument that it had attached a copy of the power of attorney to its motion to compel arbitration and had thus proved that the spouse was acting pursuant to the power of attorney. This court did not find the argument persuasive, taking pains to point out that in both *Titus* and *Jordan*, "the space on the arbitration agreement *was not marked by either party to indicate that the Responsible Party was acting pursuant to any legal authority, such as a power of attorney*. Nor is there any indication in our record that the power of attorney was provided to [the nursing home] *at the time of* [*the patient's*] *admission to the nursing home or when the relevant documents were signed*." *Id.* at 9 (emphasis added). Thus, the court concluded that there was no clear indication in the arbitration agreement to demonstrate whether the husband had signed in his individual capacity or in a representative capacity; therefore, because the agreement was ambiguous, the nursing home failed in its burden of proving an agency relationship. *Id.* at 10.

Here, although the manner in which Ellis signed the agreements is practically identical to the manner in which the agreements were signed in *Titus* and *Jordan*, the critical distinction is the fact that when Ellis signed the agreements, she checked the box stating that a copy of her power of attorney had been provided to the facility and was attached. In cases in which we have affirmed the denial of a motion to compel arbitration, that box *was not*

12

checked. *See, e.g., White*, 2024 Ark. App. 307, at 3, 689 S.W.3d at 687 (no check mark in the blank); *Nursing & Rehabilitation Center at Good Shepherd, LLC v. Richardson*, 2023 Ark. App. 427, at 3, 676 S.W.3d 375, 377 (designated space left blank); *Crawford Operations, LLC v. Davis*, 2023 Ark. App. 277, at 7, 668 S.W.3d 527, 531 (space left blank); *Faulkner-Progressive Eldercare Servs., Inc. v. Carson*, 2023 Ark. App. 162, 662 S.W.3d 268 (space left blank).

Ellis marked the space on the arbitration agreement indicating that she was acting under the legal authority of a power of attorney and that a copy of that power of attorney had been provided to the facility. There was thus evidence that she was signing the agreements in a representative capacity, not in her individual capacity. The circuit court therefore erred in concluding to the contrary.

### C. Validity of Power of Attorney

Heather Manor next argues that the circuit court erred in finding that the power of attorney granted by Marshall to Ellis was invalid. The power of attorney, which was signed with an "X," bears the signature of two witnesses and the seal of a notary public. The notary's acknowledgment states that "[o]n this day personally appeared before the undersigned, a Notary Public . . . , JAMES E. MARSHALL to me well known as the individual in the foregoing instrument, and stated that he had executed the same for the consideration and purposes therein mentioned and set forth." The circuit court acknowledged the witness signatures but reasoned that "generally when witnesses to a mark are made, the witnesses sign as stating that they had witnessed the mark of the signature of the "X" intended to be

13

the signature. That's old law which I may be the only one here that remembers that, but . . . ."

The circuit court erred. Arkansas Code Annotated section 28-68-105 (Repl. 2012) provides that "[a] power of attorney must be signed by the principal or in the principal's conscious presence by another individual directed by the principal to sign the principal's name on the power of attorney. A signature on a power of attorney is presumed to be genuine if the principal acknowledges the signature before a notary public or other individual authorized by law to take acknowledgments." Moreover, a document "signed by mark, is just as effective as if signed by a written signature, absent an affirmative showing that it was not signed." *Smith v. Wharton*, 349 Ark. 351, 361, 78 S.W.3d 79, 85 (2002) (citing *Henry v. Union Sawmill Co.*, 171 Ark. 1023, 287 S.W.2d 203 (1926)); *see also Aberdeen Oil Co. v. Goucher*, 235 Ark. 787, 791, 362 S.W.2d 20, 22 (1962) ("The signing of a deed by a properly witnessed mark does not affect its validity.").

Although Ellis complains in her brief that Heather Manor failed to authenticate the power of attorney because it did not attach a certified copy of the document, the signature of the notary public suffices for authentication purposes. *See* Ark. Code Ann. § 21-14-110 (Repl. 2022) ("All declarations and protests made and acknowledgments taken by a notary public . . . shall be received as evidence of the facts therein stated in all the courts of this state."); *Smith, supra* (where notary public's certificate of acknowledgment reflected that signatory told the notary that she signed the trust instrument, the facts stated in the acknowledgement were prima facie proof of the signatory's signature); *Fletcher v. Ark. Nat'l*

14

*Bank*, 62 Ark. 265, 35 S.W. 228 (1896) (attestation by seal was sufficient to make a prima facie case that the acts indicated had been done by the notary).[4]

We therefore conclude that the circuit court erred in finding that the power of attorney was not properly executed. We further hold that the court erred in rejecting the applicability of the FAA and in finding that the arbitration agreement was not validly signed by Ellis in her representative capacity. Accordingly, we must reverse.

Reversed.

KLAPPENBACH and WOOD, JJ., agree.

*Hardin, Jesson & Terry, PLC*, by: *Jeffrey W. Hatfield*, *Kynda Almefty*, *Carol Ricketts*, and *Kirkman T. Dougherty*, for appellants.

*McDonald Worley, P.C.*, by: *Michelle R. Eddington*; and *Johnson Firm*, by: *Christopher D. Jennings*, for appellee.

---

[4]We acknowledge that Arkansas Code Annotated section 21-14-107 (Repl. 2022), which addresses notarized signatures that are made by mark, was amended by Act 537 of 2017. The statute now provides that "[a] signature by mark on a notarial document is legal for the purposes of executing the notarial document if the mark is: (i) Made by a person who at the time of signature lacks the ability to write or sign his or her name; and (ii) Witnessed by at least one (1) disinterested person. The notary public shall write the following below a signature by mark: "Mark affixed by (Name of signer by mark) in the presence of (name(s) of witnesses)." Ark. Code Ann. § 21-14-107(4)(A) & (B). The effective date of this amendment, however, was August 1, 2017, months after the date on which Marshall signed his power of attorney with a mark on March 7, 2017.